**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRENDA URNIKIS-NEGRO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 06 C 6014** |
| | ) | |
| **AMERICAN FAMILY PROPERTY** | ) | |
| **SERVICES, INC., NICOLE LASH,** | ) | |
| **and TODD LASH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MATTHEW F. KENNELLY, District Judge:

Brenda Urnikis-Negro sued her former employer American Family Property

Services, Inc. (AFPS) and its owners Nicole Lash and Todd Lash under the Fair Labor

Standards Act, 29 U.S.C. § 216(b), and the Illinois Minimum Wage Law, 820 ILCS

105/12(a), for unpaid overtime compensation, and under the Illinois Wage Payment

Collection Act, 820 ILCS 115/11, for unpaid vacation pay. The Court conducted a

bench trial on Urnikis-Negro's claims on April 21-22, 2008. This constitutes the Court's

findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure

52(a)(1).

The Court prefaces its decision by noting that it found a good deal of the

testimony offered at trial to lack credibility, because it was delivered by plainly biased

witnesses or persons whose interest in the outcome affected, in the Court's view, their

recollection of certain events, or because the testimony simply was unreasonable or

made no sense in light of all the evidence.  In making the findings set forth below, in particular those concerning Urnikis-Negro's duties and responsibilities at AFPS, the Court has relied largely on the testimony of witnesses it considered to be lacking in bias or an interest in the outcome or whose testimony was otherwise credible, in particular Karen Boivin, Thomas Brannon, and Judy Casey, as well as on other testimony that the Court considered to have sufficient indicia of believability and accuracy in light of all the evidence.

**Facts**[1]

The Court finds the facts as follows.  AFPS was a real estate appraisal firm owned by Todd Lash and Nicole Lash.  Real estate appraisers are licensed by the State of Illinois.  There are two relevant categories of licensed appraisers:  associate appraisers and certified appraisers.  To become a associate appraiser, a person must complete specified training and pass a state examination.  To become a certified appraiser, a person must have an associate appraiser's license for a specified period, complete additional training, and pass a separate state examination.

Todd Lash became licensed as an associate appraiser in the late 1990's and became a certified appraiser in or about 2000.  He and his wife Nicole Lash started AFPS - then called Epic Appraisal - in 2003.  (The Court will refer to the defendant entity only as "AFPS" for the sake of simplicity.)  Lenders retained AFPS to conduct appraisals on residential properties on which they were considering making mortgage loans.

---

[1] Facts concerning the issue of damages are addressed later in this decision.

Through early 2004, Todd Lash was the only certified appraiser at AFPS. He worked with a number of associate appraisers, some of whom worked on-site at AFPS's offices and some of whom were independent appraisers who worked with AFPS on a contract basis. The associate appraisers typically prepared the appraisal reports. Lash reviewed each report, approved it if appropriate, and forwarded it to the lender that had retained AFPS to conduct the appraisal.

AFPS hired Urnikis-Negro in July 2004. The volume of AFPS's business was growing, and Lash wanted assistance in reviewing appraisal reports prepared by associate appraisers so that he could spend less time at AFPS. Lash told Urnikis-Negro he would train her so that she could assist in that function. Lash also agreed to pay for appraisal classes for Urnikis-Negro so that she could eventually become an associate appraiser. Urnikis-Negro had previously worked at LaSalle State Bank as office manager of the loan department and had no experience with real estate appraisals.

Lash hired Urnikis-Negro at a salary of $1,000 per week. This was, at the time, the highest salary paid to anyone working for AFPS, and it represented a significant increase over what Urnikis-Negro had made in her job at LaSalle State Bank. Lash agreed to pay Urnikis-Negro at this level because he wanted to devote more time to other pursuits and could not do so unless he hired someone to assist with some of the more time-consuming aspects of his work at AFPS.

Urnikis-Negro understood that she would be an employee of AFPS. In her initial paycheck, however, AFPS paid her as one might pay an independent contractor – in other words, without withholding income or Social Security taxes from her pay. After

Urnikis-Negro complained about this, AFPS changed her method of pay and began to withhold taxes from her paycheck.  It was clear from the evidence that Urnikis-Negro was, at all times, an employee of AFPS, not an independent contractor.  Despite this, Lash and AFPS initially tried to treat her as an independent contractor for payroll purposes, contrary to their mutual understanding, in an effort to avoid their legal obligation to withhold and pay income and Social Security taxes on her behalf.

When Lash hired Urnikis-Negro, they did not discuss the specific number of hours she would be working, and Urnikis-Negro was not given a set schedule of what hours she would work on what days.  Her job was task-oriented, and her days and hours depended on the volume of business AFPS had.  Though Urnikis-Negro likely believed that she would be working forty-hour weeks, her understanding was that her salary was to cover whatever time she was called upon to work in a given week.  On the other hand, Lash testified at his deposition that all employees of AFPS were paid on a basis of a forty hour work week.  Though it is less than crystal clear what he meant by this, it is a fair reading that this testimony reflected Lash's recognition that the law required paying employees, at least non-exempt employees, extra for time worked in excess of forty hours per week – whether or not he or AFPS ever intended to comply with that requirement.  In any event, as things turned out, Urnikis-Negro ended up working far more than forty hours per week and far more hours than she originally expected.

During her first few weeks on the job, Urnikis-Negro worked with Lash to observe him so she could learn the process he followed to review appraisal reports.  After a few weeks, Urnikis-Negro began to work without direct supervision.

Urnikis-Negro's duties included a number of largely clerical functions, including filing appraisal reports, answering the telephone, making calls to mortgage brokers and lenders (from a list supplied by Lash) to solicit new business, and making calls to collect on outstanding invoices for appraisals AFPS had done. None of these tasks involved the use of judgment or discretion on Urnikis-Negro's part, nor did defendants so contend at trial.

Urnikis-Negro also communicated with AFPS's clients, typically lenders who had requested appraisals. On some occasions, a lender would call to inquire regarding the status of an appraisal; Urnikis-Negro would contact the appraiser assigned to the property to determine the status of his or her work and then would communicate this to the lender. On other occasions, a lender would advise AFPS of errors or deficiencies in appraisals; again, Urnikis-Negro would communicate the particular problem to the appraiser who had done the work. On some occasions, an appraiser's report would be rejected, but the rejection came from the lender, not from Urnikis-Negro, who simply communicated the lender's decision. Again, this particular job responsibility did not involve the use of judgment or direction on Urnikis-Negro's part.

Of greater significance to the present case, Urnikis-Negro's duties included reviewing appraisal reports prepared by associate appraisers and outside certified appraisers. Urnikis-Negro reviewed the reports for errors and inconsistencies and to check whether they conformed to the requirements of the particular lender for which the appraisal was being done. The Court finds, based on the credible evidence in the case, that Urnikis-Negro's work in this regard largely consisted of that of a glorified proofreader. Her responsibility in reviewing the appraisal reports was to make sure that

all the necessary parts of the report form were filled in, the form did not contain facially apparent errors, and it did not have internal inconsistencies. In addition, as indicated above, on some occasions Urnikis-Negro was responsible for communicating to the appraiser deficiencies that had been noted by the mortgage lender. These duties, which took up the majority of the time Urnikis-Negro spent on the job, did not involve the exercise of discretion or judgment on her part. Rather, Urnikis-Negro simply ensured that forms had been filled out correctly, completely, and without errors. Any discretion or judgment exercised in connection with the appraisal forms was exercised by the appraiser, who had ultimate responsibility (both practically and legally) for everything in the appraisal report.

To be sure, Urnikis-Negro's duties in reviewing appraisal reports did involve, to a relatively minor degree, something more than simply making sure that reports had been filled out completely and did not include patent mistakes. Specifically, Urnikis-Negro was responsible for identifying problems that might crop up upon a lender's review of the report. To some extent, it is more accurate to refer to this particular responsibility as that of an issue-spotter rather than that of a glorified proofreader. But Urnikis-Negro's function was simply to identify such issues, not to resolve them. When she spotted a potential problem, her role ended when she communicated it to the appraiser who had prepared the report. As indicated earlier, the appraiser(s) signing the report had the sole responsibility to determine what was and was not included in the report. Any discretion or judgment applied in connection with the issuance of an appraisal report was, therefore, that of the appraiser, not Urnikis-Negro.

One of the key aspects of a real estate appraisal is to determine appropriate

"comparables" (comparable properties).  The associate appraiser would include in his or her report delivered to AFPS a selection of comparable properties, as well as the adjustments necessary to determine a value for the property being appraised.  The selection of comparables involves the exercise of judgment.  Urnikis-Negro's job duties did not involve selection of comparables.  That was the responsibility of the associate appraiser and/or a certified appraiser, and Urnikis-Negro did not work in either of those roles for AFPS.

The evidence showed that on occasion, Urnikis-Negro suggested possible comparables to associate or certified appraisers after reviewing their reports and, in doing this, may have consulted computerized Multiple Listing Service databases to which AFPS had access.  On these occasions, however, the appraiser made the decision whether to adopt Urnikis-Negro's suggestion and retained the sole discretion to determine what comparables to include in the report.  Urnikis-Negro's role in these situations was merely to suggest the use of a different comparable.  There was no credible evidence that she ever inserted a comparable into an appraisal on her own or, for that matter, that she made any changes in an appraisal without being told or asked to do so by the appraiser.  And, in any event, the occasions on which Urnikis-Negro made suggestions regarding comparables were infrequent and did not constitute a significant portion of her work.  Nor was this what Lash or AFPS had hired Urnikis-Negro to do.

In sum, neither AFPS nor Todd Lash hired Urnikis-Negro to exercise judgment or discretion in connection with appraisals or otherwise.  Rather, Lash and the company expected her, with regard to appraisal reports, to perform only the essentially ministerial

7

function of reviewing the completeness and internal consistency of draft appraisal reports, and to note for the appraiser areas in which Lash or the lender might question the report.

In situations when Urnikis-Negro was reviewing a draft appraisal report prepared by an associate appraiser, a certified appraiser (usually Todd Lash, but not always) also had to approve the report – typically because the lender that had retained AFPS expected this. Lash, who reviewed such reports before approving them, gave Urnikis-Negro authorization to affix his signature to appraisal reports electronically.[2] When Urnikis-Negro did this, she acted only based on Lash's authorization; she did not have the authority to affix his signature to an appraisal without such authorization. The Court notes that it appears to have been a relatively common occurrence for Urnikis-Negro to affix Lash's electronic signature to appraisal reports on which a box was checked off stating that Lash had inspected the property, when in fact he had not done so. This occurred in situations in which the particular lender required that a certified appraiser inspect the property. It appears that the check-off of this box on the report may have been a "default" in the computer program AFPS used to prepare reports. Lash admitted at trial that he knew this was occurring – in other words, that he knew false statements were being made under his name to these particular lenders. It is a reasonable inference that Urnikis-Negro acted at Lash's direction in this regard.

Urnikis-Negro had no assigned job title. She referred to herself, on occasion, as

---

[2] On occasion, Urnikis-Negro similarly would affix the electronic signature of another certified appraiser doing work for AFPS, again with the appraiser's permission following his or her approval of the report.

quality control manager, compliance director, or similar titles. In the Court's view, Urnikis-Negro did this in a self-aggrandizing way to portray herself as a trusted professional, not because Todd Lash or anyone had given her any such title.

Urnikis-Negro became a licensed associate appraiser in the late summer of 2005. She did not, however, perform any appraisal duties for AFPS and was never asked to do so by Todd Lash or anyone else at the company.

AFPS had a relatively penurious vacation pay policy. AFPS employees were entitled to no paid vacation during their first year of work and five days of paid vacation their second year. Urnikis-Negro's first year of work sometime in July 2005, and she earned five vacation days at that point, to be used over the following year. She used all five days during the month of July 2005. Later in 2005, Urnikis-Negro indicated that she believed she had additional paid vacation time coming but was advised that she had used all her accrued time for the year. Her next five paid vacation days would not be earned until she completed her second year, in July 2006. Because Urnikis-Negro did not work for AFPS that full year, she never earned additional vacation time beyond the five days she had already used.

AFPS terminated Urnikis-Negro a few days before the end of 2005. The volume of the company's business had dropped significantly, and it either no longer needed or could no longer afford her services. The fact that the company learned Urnikis-Negro was interviewing for a new job may have had something to do with the timing of her termination. The specific reason for the termination, however, is not a material issue in this case.

**Discussion**

The Fair Labor Standards Act requires an employer to pay an employee one and one-half times the employee's regular rate for any hours worked in excess of forty hours per week.  29 U.S.C. §§ 207(a)(1).  Employees who are "employed in a bona fide . . . administrative . . . capacity," as that term is defined by the Secretary of Labor, are exempt from the FLSA's overtime requirements.  *Id.* § 213(a)(1).  Because Congress delegated to the Secretary of Labor the authority to define the scope of the exemption, the Secretary's regulations providing that definition have the force of law.  *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532 (7th Cir. 1999).  The Secretary has also published interpretative guidelines, which do not have the force of binding law but nonetheless are useful as persuasive evidence of the legislative and regulatory intent.  *See Shaw v. Prentice Hall Computer Publ'g, Inc.*, 151 F.3d 640, 642 (7th Cir. 1998).

Urnikis-Negro began working at AFPS in July 2004.  Prior to August 23, 2004, an employee was considered to be employed in a bona fide administrative capacity when the employee's (1) "compensat[ion] [was] on a salary or fee basis at a rate of not less than $250 per week," (2) her "primary duty consist[ed] of either the performance of nonmanual work directly related to management policies or general business operations of the employer or the employer's customers," and (3) the "performance of such primary duty includes work requiring the exercise of discretion and independent judgment."  Former 29 C.F.R. § 541.214 (2003 version).  As of August 23, 2004, an employee satisfies the administrative exemption when her (1) "[c]ompens[ation] [is] on a salary basis at a rate of not less than $455 per week," (2) her "primary duty is the

performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) her "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200.

The amended version of the regulatory definition does not apply retroactively. *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 870 (7th Cir. 2008); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005).  That said, the August 2004 version of the regulation does not substantively alter the former test.  *See Roe-Midgett*, 512 F.3d at 870; *see also, Darveau v. Detecon, Inc.*, 515 F.3d 334, 338 (4th Cir. 2008).  For this reason, because Urnikis-Negro worked for AFPS for only about one month before the August 2004 regulation took effect, and for the sake of simplicity, the Court will apply the more recent new version of the regulation.

The administrative exemption is an affirmative defense on which the employer bears the burden of proof.  *Roe-Midgett*, 512 F.3d at 869; *Kennedy*, 410 F.3d at 370. The exemption, like others in the FLSA, is construed narrowly.  *See Demos v. City of Indianapolis*, 302 F.3d 698, 701 (7th Cir. 2002).  The Seventh Circuit has made it clear, however, that this principle of statutory construction is essentially "a tie breaker," and that the employer does not bear any sort of enhanced burden of proof beyond the normal preponderance-of-the-evidence burden.  *See Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 507-08 (7th Cir. 2007).

There is no question that Urnikis-Negro's work involved "matters of significance," as the performance of appraisals was the core function of AFPS's business.  *See*

*Roe-Midgett*, 512 F.3d at 871. The primary issue in this case is whether her duties

involved "the exercise of discretion and independent judgment."

The Secretary's interpretive guidelines regarding the administrative exemption

state:

(a) To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

(b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

(c) The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions

made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. For example, the policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client.

(d) An employer's volume of business may make it necessary to employ a number of employees to perform the same or similar work. The fact that many employees perform identical work or work of the same relative importance does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance.

(e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. See also § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

(f) An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly. For example, a messenger who is entrusted with carrying large sums of money does not exercise discretion and independent judgment with respect to matters of significance even though serious consequences may flow from the employee's neglect. Similarly, an employee who operates very expensive equipment does not exercise discretion and independent judgment with respect to matters of significance merely because improper performance of the employee's duties may cause serious financial loss to the employer.

29 C.F.R. § 541.202.

As the interpretive guideline states, an employee typically is considered to

exercise discretion and independent judgment only if she compares and evaluates possible courses of conduct and then makes a decision. 29 C.F.R. § 541.202(a); *see Piscione*, 171 F.3d at 535. Without this limitation, nearly every worker would meet the "discretion" requirement, because nearly every worker exercises some form of judgment depending on how broadly that term is understood. *Clark v. J.M. Benson Co.*, 789 F.2d 282, 287-88 (4th Cir. 1986).

The Court has found that Urnikis-Negro did not make decisions about appraisals (or otherwise) and did not have the authority to do so. Rather, she essentially proofread or checked the work of others and pointed out possible errors and omissions. In a small number of situations, she made suggestions to the appraiser regarding comparable properties. That, however, was not part of her job and was not what she was hired to do. Urnikis-Negro essentially took it upon herself to make these suggestions. The appraisers had sole control over the content of their reports and were entirely free to ignore or reject her suggestions. There is no indication that her suggestions carried any weight whatsoever.

The Secretary's interpretive guidelines, quoted in full above, say that "the exercise of discretion and independent judgment implies a freedom from immediate direction or supervision." 29 C.F.R. § 541.202(c). That said, an employee can still exercise discretion though her decisions are subject to a superior's review or reversal. *Id.* Thus, the fact that work of the employee in *Haywood,* who investigated, negotiated, and settled customer complaints, was reviewed by her supervisors did not defeat her exempt status. *Haywood*, 121 F.3d at 1073. But in *Haywood*, the employee actually made decisions; it appears that the supervisory review was done after-the-fact. By

contrast, the evidence in the present case reflected that Urnikis-Negro did not make decisions; she made only suggestions after spotting potential issues.

Urnikis-Negro's work satisfies, at most, one of the ten factors identified in 29 C.F.R. § 541.202(b): she carried out what arguably were major assignments. There is no evidence that she had the authority to formulate, interpret, affect, or implement management policies or practices; to commit AFPS in significant matters; to waive or deviate from established procedures without prior approval; to negotiate or bind the company on significant matters; to provide consultation or expert advice to AFPS management; to plan corporate business objectives; to investigate or resolve significant matters on management's behalf; or to represent AFPS in handling complaints, disputes, or grievances. A straight-faced argument can be made that her work "affect[ed] business operations to a substantial degree," because appraisals were the core function of AFPS. In fact, however, Urnikis-Negro she was doing little more than double-checking the work done by those whose responsibilities *actually did* affect the company's operations – namely, the appraisers. Though the ten factors cited in the regulation are non-exclusive, and there is no minimum number that an employee must meet to be considered subject to the administrative exemption, the Court cannot conclude that an employee who, like Urnikis-Negro, only arguably fit within one or two of those factors has been proven to be exempt from the FLSA's requirements.

For these reasons, the Court concludes that defendants have not met their burden of proof that Urnikis-Negro is subject to the FLSA's administrative exemption, the only exemption claimed to apply. Urnikis-Negro was entitled to be paid compensation for overtime above and beyond her regular pay. She has proven the

15

defendants liable under both the FLSA and under the Illinois Minimum Wage Law's parallel provisions.

Urnikis-Negro has also proven by a preponderance of the evidence that defendants acted with reckless disregard of her rights and their obligations under the FLSA in failing to pay her overtime compensation.  This entitles her to recover unpaid overtime for up to three years prior to the date she filed suit, a period that encompasses the entire term of her employment at AFPS.  *See* 29 U.S.C. § 255(a); *Bankston v. State of Illinois*, 60 F.3d 1249, 1253 (7th Cir. 1995) (reckless disregard amounts to willfulness under FLSA).  As stated earlier, Lash's deposition testimony evinced an awareness of the requirement to pay employees extra for hours worked in excess of forty per week. The evidence also showed that he and AFPS rather routinely disregarded their legal obligations vis-a-vis employee pay (e.g., tax withholding and payment of Social Security taxes), not to mention vis-a-vis certain lenders that retained AFPS (by making false statements regarding whether the appraiser had inspected the property).

Urnikis-Negro has not, however, shown by a preponderance of the evidence that defendants failed to pay her vacation pay that she was owed.  As the Court has found, under established AFPS policy, Urnikis-Negro had not earned the additional vacation time she claims.

### Damages

Urnikis-Negro contends she is entitled to be compensated for 2,508.75 hours of overtime work at the rate of time-plus-one-half.  She contends her regular hourly wage rate was $25.00 per hour, calculated by dividing her regular weekly pay of $1,000 by forty, and thus her rate for overtime pay rate is $37.50 per hour.

Urnikis-Negro provided what she claimed were conservative estimates during her testimony on direct examination. During the entire time she worked at AFPS, she stated, she essentially worked non-stop from the time she arrived at work to the time she left, without leaving – whether to go home, to take lunch, or for other purposes. Urnikis-Negro testified that for her first eight or so months at AFPS – the thirty-two weeks from her hire date through the end of February 2005 – she typically arrived at work at 7:00 a.m. and left work at 12:30 a.m. Monday through Thursday (and at times, she says, she worked even longer). On Fridays during this period, Urnikis-Negro testified, she arrived at work at 6:00 a.m. and left at 8:00 p.m. Her work week from Monday through Friday thus totaled eighty-four hours. She also testified that she worked one weekend day every second week.

From March through June 2005, Urnikis-Negro testified, her workload was slightly lower. She testified that during this seventeen week period, she worked from 8:00 a.m. through 10:00 p.m. Monday through Thursday and 6:00 a.m. through 7:00 p.m. Friday, as well as one weekend day every second week.

From July through December 2005 (when she was terminated), Urnikis-Negro stated, the workload, and thus her work hours, decreased a bit more. She testified that during this twenty-six week period, she worked from 9:00 a.m. through 8:00 p.m. Monday through Thursday, and 8:00 a.m. through 6:00 p.m. Friday, as well as one weekend day every second week.

The Court found Urnikis-Negro's work-hour testimony significantly exaggerated and largely lacking in credibility. First, her testimonial description of her work hours exceeded, albeit to a modest degree, specific allegations she made in the complaint

17

she filed in this case.  In addition, to believe Urnikis-Negro, one would have to believe that she left her two middle-school-age children[3] at home alone every day both before and after school (and on non-school days during summer and other periods) and during the evening, without taking them to school, picking them up, or ever leaving the work site to check in on them.  The Court did not find this testimony believable.  The most Urnikis-Negro could say in this regard was that she left it to a male friend from AFPS, a person she had only recently met (at least in the early stage of her work) to look in on her children from time to time.  The Court did not find that this plausibly described the state of affairs during the relevant period.  Urnikis-Negro's credibility was also impeached in other significant ways not directly related to her work-hour testimony.  For these reasons, and based on the Court's observation of her demeanor, the Court finds Urnikis-Negro's testimony insufficient to establish the number of unpaid overtime hours she worked.

The Court has no doubt, however, that Urnikis-Negro typically worked well over forty hours per week.  This determination is supported by evidence regarding the overall volume of AFPS's business during the relevant period, the testimony of Patricia Lash (Todd Lash's mother) that Urnikis-Negro typically was already at work with Patricia arrived, and other evidence submitted at trial, including elements of Urnikis-Negro's testimony that the Court credits.  Even though some of this evidence was introduced by the defense, it is well established that in determining whether a plaintiff has met her burden of proof, a fact finder may consider all the evidence, no matter who introduced

---

[3]  By the time Urnikis-Negro was terminated, one of her children had reached the ninth grade of school.

it.  *See, e.g.*, Seventh Cir. Pattern Civil Jury Instruction 1.09; *see also, Hernandez v. Cowan*, 200 F.3d 995, 998 (7th Cir. 2000) (applying this principle to a criminal case).

The Court is left to determine by inference and circumstantial evidence how many overtime hours Urnikis-Negro worked.  That does not defeat her entitlement to recover damages.  Though damages may not be based entirely on speculation, a plaintiff need only prove her damages to a reasonable degree of certainty.  *See, e.g., R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709, 712 (7th Cir. 1991) (breach of contract case); *see generally, Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931).

The Court finds that it is more probable than not (that is, by a preponderance of the evidence) that Urnikis-Negro typically arrived at work about 8:15 a.m., after dropping off one of her children at school, except for the period from July through December 2005, when, as she testified, she arrived later, around 9:00 a.m.  The Court also finds that she typically left work in the afternoon for a period around the time her children left school, and then returned to work, leaving work for good later in the evening.  There is no basis to believe that Urnikis-Negro's average work hours varied from this during periods when school was not in session.

The Court therefore determines that Urnikis-Negro worked, on average, twelve hour days five days per week from her start date through the end of June 2005, and ten hour days from July through December 2005, a period during which the volume of work at AFPS had dropped somewhat.  The Court also found persuasive Urnikis-Negro's testimony that she typically worked approximately six and one-half hours every second

weekend throughout the relevant period.

Based on these findings, the Court determines that Urnikis worked the following number of hours per week during the relevant period:

- July 2004 through June 2005 (49 weeks):

24 weeks at 66.5 hours

25 weeks at 60 hours

- July 2005 through December 2005  (27 weeks):

14 weeks at 50 hours

13 weeks at 56.5 hours

Urnikis-Negro contends she is entitled to be compensated for all time worked over forty hours per week at the rate of $37.50 per hour.  The Court disagrees and concludes that the "fluctuating hours" method of calculating overtime pay is the appropriate methodology in this case to determine the amount of unpaid overtime. Under Department of Labor regulations,

> [a]n employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many.  Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.  Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from

> week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

29 C.F.R. § 778.114(a). In this case, the credible evidence showed that, as required by the regulation, there was a "clear mutual understanding" between Urnikis-Negro and Todd Lash that her fixed salary of $1,000 per week or $52,000 per year was to serve as her compensation, apart from overtime premiums, for whatever number of hours she worked each week, rather than for working forty hours or some other fixed period. *See, e.g., Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 39-40 (1st Cir. 1999).

Based on the regulation and its illustrative example, the Court calculates the amount of overtime pay due to Urnikis-Negro as follows. *See generally Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1138-39 (5th Cir. 1988). First, for the period from July 2004 through June 2005, Urnikis-Negro worked 24 weeks at 66.5 hours. For these weeks, her effective regular hourly rate was $15.00 per hour, and thus she is entitled to additional compensation of $7.50 for 26.5 hours in each of those 24 weeks. The total overtime compensation for these weeks is $4,770. Second, during that same period, Urnikis-Negro worked 25 weeks at 60 hours. For these weeks, her effective regular hourly rate was $16.66 per hour, and thus she is entitled to additional compensation of $8.33 for 20 hours in each of those 25 weeks. The total overtime compensation for these weeks is $4,165. Third, during the period from July 2005 through December 2005, Urnikis-Negro worked 14 weeks at 50 hours. For those weeks, her effective hourly rate was $20 per hour, and thus she is entitled to additional

21

compensation of $10 for 10 hours in each of those 14 weeks. The total overtime compensation for these weeks is $1,400. Fourth, during that same period, Urnikis-Negro worked 13 weeks at 56.5 hours. For those weeks, her effective hourly rate was $17.70 per hour, and thus she is entitled to additional compensation at 8.85 for 16.5 hours in each of those 13 weeks. The total overtime compensation for these weeks is $1,898.

In sum, the Court finds that the total amount of overtime compensation due to Urnikis-Negro as a result of defendants' violation of the FLSA is $12,233 ($4,770 + $4,165 + $1,400 + $1,898). She is also entitled to liquidated damages in an equal amount. Liquidated damages are presumptively available when the FLSA is violated. *See, e.g,. Bankston*, 60 F.3d at 1254. There is no indication that the defendants acted reasonably or in good faith in failing to pay overtime wages; rather, the defendants recklessly disregarded their obligations under this statute, just as they sought to flout their obligations under the income tax withholding and Social Security laws. Thus, the Court awards plaintiff damages in the total amount of $24,466 and will enter judgment in that amount as to Counts 1 and 2.

Urnikis-Negro is also entitled to an award of attorney's fees and costs. *See* 29 U.S.C. § 216(b). Pursuant to the Court's authority under Local Rule 54.3(b), the Court will shorten the time for compliance with Rule 54.3, as set forth below.

**Conclusion**

For the reasons stated above, the Court directs the Clerk to enter judgment in favor of plaintiff and against all defendants on Counts 1 and 2 in the amount of $24,466 on each count (these amounts are cumulative), and in favor of defendants on Count 3.

Plaintiff's disclosures under Rule 54.3(d)(1-3) are to be made by July 31, 2008; defendants' disclosures under Rule 54.3(d)(5) are to be made by August 11, 2008; the joint statement under Rule 54.3(e) and plaintiff's motion under Rule 54.3(f), if any, are to be filed by August 25, 2008; defendants' response to the motion is to be filed by September 8, 2008; and plaintiff's reply is to be filed by September 15, 2008. The Court sets the matter of attorney's fees and costs for ruling on September 22, 2008 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date;  July 21, 2008